**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------X

STAYMON BRAITHWAITE,                              Case No.

                        Plaintiff,                     **COMPLAINT**

        -against-

                                         **Jury Trial Demanded**

YOUNG ADULT INSTITUTE, INC., and
FABIAN NELSON,

                      Defendants.
------------------------------------------------------------X

      Plaintiff Staymon Braithwaite ("Braithwaite" or "Plaintiff") alleges against Defendants

Young Adult Institute, Inc., ("YAI") and Fabian Nelson ("Nelson") (collectively, "Defendants")

upon information and belief, as follows:

### NATURE OF THE CLAIMS

1. Braithwaite complains pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

   2000(e), *et seq.*, ("Title VII"), the American with Disabilities Act of 1990, as amended, 42

   U.S.C. §§ 12101 *et seq.*, ("ADAAA"), the New York State Human Rights Law, N.Y. Exec.

   Law § 290, *et seq.*, ("NYSHRL") and the New York City Human Rights Law, N.Y. Admin.

   Code §8-101, *et seq.* ("NYCHRL"), seeking damages to redress the lost wages and emotional

   distress he has suffered and continues to suffer as a result of being discriminated against by

   his former employer on the basis of his **sex/gender (due to his sexual orientation) and**

   **disability** and retaliated against by his former employer after complaining of discrimination.

2. The Federal and New York State/City anti-discrimination and anti-retaliation laws are

   intended to afford all employees the same rights, no matter if they are disabled and regardless

   of their sexual orientation, and provide them with the dignity and respect they deserve in the

   workplace.  As such, this is an action for declaratory, injunctive, and monetary relief to

redress Defendants' unlawful employment practices, including unlawful discrimination and retaliation committed against the Plaintiff.

3. Additionally, Braithwaite complains pursuant to the Families First Coronavirus Response Act, Pub. L. No. 116-127, 134 State. 178 ("FFCRA") and the Emergency Paid Sick Leave Act, FFCRA §§ 5102, *et seq.*, ("EPSLA"), seeking relief for Defendants' unlawful actions, including compensation for Defendants' failure to provide Braithwaite paid time off for 80 hours of Coronavirus sick leave and for retaliating against Braithwaite as a result of his attempts to assert his rights under the aforementioned statutes.  For Defendants' violations of the aforementioned statutes, Braithwaite seeks compensatory damages, liquidated damages, statutory civil damages, pre-and post-judgment interest, and attorney's fees and costs.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over Plaintiff's claims pursuant to the provisions of 28 U.S.C. §§ 1331, 1337, 1343(3), and 1343(4).  This Court has supplemental jurisdiction over Plaintiff's claims under city and state law pursuant to 28 U.S.C. § 1367(a), in that the city, state, and federal claims arise from a common nucleus of operative fact such that they are so related that they form part of the same case or controversy under Article III of the United States Constitution.

5. Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), because the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

6. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## EXHAUSTION OF REMEDIES

7. On or about November 9, 2020, Plaintiff duly filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was assigned Charge Number 520-2021-00515.

8. On or about November 16, 2020, the EEOC terminated its processing of the Charge of Discrimination making no determination on the merits of the Charge and issued Plaintiff a Notice of Right to Sue.

9. Plaintiff has exhausted his administrative remedies and files this complaint within 90 days of the EEOC's issuance of his Notice of Right to Sue, satisfying all procedural prerequisites for bringing this action.

## **PARTIES**

10. At all times relevant to this action, Braithwaite was and is a resident of Kings County, New York.

11. Braithwaite is a 33-year-old homosexual male.

12. At all times relevant to this action, Braithwaite suffered from and continues to suffer from the following diagnosed disabilities: severe asthma and hypertension.

13. Braithwaite was initially diagnosed with severe asthma as a child, and he continued to suffer from severe asthma throughout his employment with YAI.

14. Braithwaite was initially diagnosed with hypertension prior to commencing his employment with YAI, and he continued to suffer from severe asthma throughout his employment with YAI.

15. At all times relevant to this action, Braithwaite's severe asthma was and is a physiological impairment that affects his respiratory system which, when triggered, causes episodes called "asthma attacks".

16. At all times relevant to this action, when Braithwaite suffers an asthma attack, he has extreme difficulty breathing and is impaired from performing other major life activities such as walking and speaking.

17. At all times relevant to this action, when he experiences an asthma attack, Braithwaite's severe asthma substantially inhibits his respiratory system from functioning.

18. At all times relevant to this action, due to the severity of Braithwaite's asthma, an asthma attack—even if treated—could result in Braithwaite's hospitalization and/or death.

19. At all times relevant to this action, Braithwaite's hypertension was and is a physiological impairment that affects his circulatory system.

20. At all times relevant to this action, Braithwaite's hypertension manifests with symptoms including difficulty breathing and severe headaches.

21. At all times relevant to this action, Braithwaite's required and continues to require medical care for both his asthma and his hypertension.

22. At all times relevant to this action, YAI was and is a domestic not-for-profit entity duly organized and existing under and by virtue of the laws of the State of New York.

23. At all times relevant to this action, YAI was and is a domestic not-for-profit entity authorized to operate in the State of New York.

24. At all times relevant to this action, YAI employed fewer than 500 employees.

25. At all times relevant to this action, YAI is a covered employer pursuant to the EPSLA and FFCRA.

26. At all times relevant to this action, YAI runs/operates an office at the premises designated and/or more commonly known as 220 East 42nd Street, 8th Floor, New York, NY 10017 ("YAI Headquarters").

27. At all times relevant to this action, YAI was and is an agency that provides services, including housing, supervision, assistance with daily life tasks, and other support for adults with intellectual and/or developmental disabilities.

28. At all times relevant to this action, YAI runs/operates a residential facility at the premises designated and/or more commonly known as 29 Tiffany Place, Brooklyn, NY 11231 ("Tiffany House").

29. For the duration of his employment with YAI, Braithwaite worked at the Tiffany House location.

30. At all times relevant to this action, Braithwaite was an employee eligible for paid sick time pursuant to the EPSLA and FFCRA.

31. At all times relevant to this action, Braithwaite was an "employee" of YAI within the meaning of all applicable statutes.

32. At all times relevant to this action, YAI was an "employer" of Braithwaite within the meaning of all applicable statutes.

33. Upon information and belief, at all times relevant to this action, Nelson was and is a resident of the State of New York.

34. At all times relevant to this action, Nelson was employed by YAI as the Supervisor of the Direct Support Professionals ("DSPs") assigned to Tiffany House.

35. At all times relevant to this action, Nelson possessed and exercised supervisory authority over Braithwaite during his employment with YAI.

36. At all times relevant to this action, Nelson's supervisory authority over Braithwaite included, but was not limited to: hiring/firing; promotion/demotion; determination and administration of discipline; evaluating performance; setting work hours and schedules; assigning tasks;

granting or denying requests for sick/vacation time; and granting or denying requests for accommodations.

37. Upon information and belief, Nelson is currently employed by YAI.

## FACTUAL ALLEGATIONS

38. On or about April 5, 2019, Braithwaite commenced employment with YAI as a DSP.

39. For the duration of his employment with YAI, Braithwaite was a DSP assigned to Tiffany House.

40. For the duration of his employment with YAI, Braithwaite earned a base rate of $15.00 per hour, working between approximately 80 and 100 hours per week.

41. Tiffany House is a residential facility housing adults with intellectual and developmental disabilities.

42. In addition to intellectual and developmental disabilities, some residents of Tiffany House are survivors of sexual assault and/or physical abuse and neglect.  Upon information and belief, at least one of the residents housed at Tiffany House during Braithwaite's employment at YAI was formerly housed at Willowbrook, the Staten Island facility infamous for the sexual and physical abuses inflicted on its residents.

43. At Tiffany House, Braithwaite's duties and responsibilities included, but were not limited to: comforting residents when they experienced behavioral outbursts, encouraging the independent residents to perform their daily tasks, and assisting the less independent residents with their daily tasks, such as using the bathroom, cutting up their food, dressing and undressing, and washing the laundry, and generally monitoring the safety of the residents.

Sex/Gender/Sexual Orientation Discrimination and Hostile Work Environment

44. Shortly after commencing employment with YAI, Braithwaite became the subject of discrimination and a hostile work environment on the basis of his sex/gender, due to his sexual orientation.

45. In or around June or July 2019, Braithwaite mentioned to Nelson in casual conversation that he is gay.

46. After Nelson learned Braithwaite is gay, she began treating Braithwaite differently.

47. By way of example, Nelson began using language common in gay culture to address Braithwaite and in conversation with him.

48. After learning Braithwaite is gay, some of the changes in Nelson's language included regularly addressing Braithwaite as **"boo"**, referring to various situations and people (including Braithwaite) as **"fierce"** when speaking with Braithwaite, and using the phrase **"you better work"** in conversation with Braithwaite.

49. Before learning Braithwaite is gay, Nelson did not make these comments or use coded gay language in conversation with Braithwaite.  Nelson did not make these comments or use coded gay language in conversation with other, heterosexual male DSPs or female DSPs.

50. In addition to the aforementioned discriminatory, offensive language, YAI forced Braithwaite to accept disparate working conditions due to his sexual orientation.

51. Pursuant to the training Braithwaite received at the beginning of his employment with YAI, it was YAI policy that male DSPs were expressly forbidden from providing intimate care to female residents unless there is an emergency **and** there are no female staff members on shift.

52. Pursuant to the training Braithwaite received at the beginning of his employment with YAI, examples of 'intimate care' that male DSPs were not permitted to provide to female residents

include, but were not limited to: dressing naked residents and fully undressing residents, assisting the residents with using the shower, monitoring residents while they were showering or using the bathroom, and any other care that required DSPs to be present while the residents were not dressed.

53. For the duration of his employment with YAI, after the training Braithwaite received at the beginning of his employment with YAI, Braithwaite was never subsequently provided training or materials from YAI indicating this policy was no longer in effect or had been modified.

54. Upon information and belief, the reason for the policy prohibiting male DSPs from providing intimate care to female residents was twofold: to preserve the dignity of the residents while they are in vulnerable and embarrassing situations, and to avoid causing trauma to residents who have survived sexual violence and domestic abuse by a male.

55. After Braithwaite disclosed to Nelson he is gay, female DSPs began regularly summoning Braithwaite to assist with caring for female residents in intimate situations.

56. Because, due to his homosexuality, Nelson viewed Braithwaite as non-threatening to the female residents, she purposefully allowed other DSPs to call Braithwaite to assist with caring for female residents in intimate situations.

57. Both Nelson and Alisha Martin ("Martin"), Assistant Supervisor and Braithwaite's direct supervisor, were aware that DSPs called Braithwaite to assist in with caring for female residents in intimate situations.

58. On several occasions, Nelson herself called Braithwaite to assist female residents in intimate situations.

59. By way of example, on several occasions, Nelson was monitoring a female resident using the shower.  During the resident's shower, Nelson called Braithwaite to monitor the female resident naked in the shower, leaving Braithwaite and the female resident alone in the bathroom while Nelson tended to other business.

60. On numerous occasions, Braithwaite was called by other DSPs to assist female residents when the resident was fully or partially naked.

61. By way of example, many times throughout his employment with YAI, Braithwaite was called by a DSP to watch a female 1:1 resident as she was on the toilet or in the shower, while the other (female) DSP attended to other matters.[1]

62. On multiple occasions, Nelson personally witnessed Braithwaite assist female residents with using the toilet at the request of another DSP.

63. On multiple occasions, Nelson personally witnessed Braithwaite assist female residents with showering at the request of another DSP.  The assistance Braithwaite was required to provide female residents with showering necessitated direct contact between Braithwaite and the female residents while they were naked.

64. On multiple occasions, Braithwaite was called to assist DSPs looking through the female residents' underwear drawers for missing items.

65. At all times relevant to this action, no male DSPs other than Braithwaite were ever called to assist with providing intimate care for female residents.

66. At all times relevant to this action, none of the times Braithwaite was called to assist female residents were emergencies with no other female DSPs available.

---

[1] At YAI, a 1:1 resident is a resident who has extremely limited independence, and at least one DSP is required to monitor the resident at all times while the resident is awake.

67. Both Braithwaite and other female DSPs expressed discomfort to Nelson that the female residents were being cared for in intimate situations by a male DSP—Braithwaite—in violation of YAI policy.

68. On one occasion in or around December 2019, DSP Jaclyn Phillips ("Phillips") summoned Braithwaite to assist her with a female resident, despite other female DSPs being available to assist.  Another DSP, Patricia Johnson ("Johnson"), notified Nelson that Braithwaite, at Phillips's direction, was assisting with a female resident while the resident was naked.  In response to Johnson's expression of concern that male DSPs were not supposed to assist female residents in intimate situations, Nelson said that Braithwaite could assist the female resident.

69. Despite Braithwaite's and other DSP's protestations, Nelson continued to require Braithwaite to assist female residents in intimate situation.

70. In addition to the referenced discriminatory conduct, YAI further discriminated against Braithwaite and subjected him to a hostile work environment on the basis of his male sex/gender and his homosexuality by burdening him with a disproportionately heavy workload.

71. YAI required Braithwaite to work with all residents—both female and male—in intimate and non-intimate situations.

72. For most of Braithwaite's employment at YAI, Tiffany House had more male residents than female residents, and a greater proportion of the male residents required intensive care.

73. At all times relevant to this action, except for Braithwaite, no male DSPs were directed to work with female residents, even in non-intimate situations.

74. At all times relevant to this action, except for me, no male DSPs were permitted to work with female residents in intimate situations.

75. As a result, due to Braithwaite's sexual orientation and sex/gender, YAI forced Braithwaite to carry a significantly heavier workload than any other DSP at Tiffany House.

76. In or around March 2020, Braithwaite requested from Nelson one day off from work to receive a delivery of furnishings to his new apartment, indicating he had no other way to receive the delivery.

77. Nelson responded by scoffing at Braithwaite and asking him, "Who are you trying to impress?", insinuating that because he is not romantically interested in women, furnishing his residence was unimportant.

78. Nelson further responded to Braithwaite's request by telling him if he took the day off, she was going to cut his hours.

79. Prior to his request for a day off, Braithwaite never missed a scheduled day of work at YAI since the commencement of his employment.

80. Throughout his employment with YAI, Braithwaite frequently worked hours beyond his scheduled shift and covered shifts for other employees on short notice, greatly helping Nelson and YAI meet their staffing needs.  As a result, Braithwaite frequently worked double and even triple shifts—between approximately 80 and 100 hours per week—sacrificing his personal life to accommodate Nelson and YAI.

81. Nelson's refusal to grant Braithwaite's requested day off contrasted with her treatment of female and heterosexual male DSPs with similar requests.

82. By way of example, Nelson permitted female and heterosexual male DSPs to take days off, occasionally without notice and without having to provide any justification, with no repercussions to the DSP.

83. Nelson herself took days off without notifying staff—including Martin—resulting in YAI staff having no way to contact Nelson in case of emergency.

84. Braithwaite was deeply insulted by Nelson's hurtful comments and refusal to provide him the same courtesies she provided the other DSPs who are not openly homosexual.  Braithwaite was particularly offended by this discriminatory treatment given his clearly evident work ethic and highly regarded performance, especially when the other DSPs who were not openly homosexual—and Nelson herself—were routinely allowed to take days off with no hassles or repercussions.

85. In or around March 2020, Braithwaite took the requested day off despite Nelson discriminatory denial of his request.

86. Immediately after Braithwaite took the day off in or around March 2020, Nelson followed through with her promise and retaliated against Braithwaite.

87. For the subsequent weeks after Braithwaite's day off, Nelson cut two of his shifts, resulting in him working fewer hours and earning less pay.

88. Braithwaite was only restored to his full schedule once YAI's staffing situation became untenable due to the Coronavirus pandemic.

89. Nelson cutting Braithwaite's hours was discriminatory on the basis of his gender/sex.

90. Beginning in or around March 2020, due to the Coronavirus pandemic and YAI's related staffing issues, Braithwaite went above and beyond his usual duties and responsibilities.

91. By way of example, in or around March 2020, Braithwaite began spending a substantial amount of time assisting Phillips with her duties, because Phillips was suffering from extremely poor, chronic, and degenerating eyesight.

92. With YAI extremely short staffed, Braithwaite was required to take on a greater role assisting Phillips.

93. Braithwaite continued to provide superior care for the residents and his performance was excellent, even with his additional responsibilities.

94. At all times relevant to this action, Braithwaite performed more work than any other Tiffany House DSP.

95. At all times relevant to this action, Braithwaite's performance was superior to most, if not all DSPs, including Phillips and Johnson.

96. In or around June 2020, Nelson conducted her performance review of Braithwaite and rated his performance as 'Satisfactory'.

97. In or around June 2020, Nelson conducted performance reviews of other DSPs, including Phillips and Johnson.

98. Other DSPs who were subjected to performance reviews from Nelson in or around June 2020, including Phillips and Johnson, received superior performance ratings from Nelson despite performing less work and performing more poorly than Braithwaite.

99. In or around June 2020, shortly after receiving his 'Satisfactory' rating from Nelson, Braithwaite complained to Nelson, objecting to the classification of his performance as only 'Satisfactory'.

100.    In or around June 2020, Braithwaite and Nelson met to discuss Braithwaite's objections to Nelson's performance review.

101.    During the meeting to discuss Braithwaite's performance review, Braithwaite complained to Nelson that she was subjecting him to discrimination because he was the only male forced to work with the female residents in both intimate and non-intimate situations and pointed out that it was against YAI policy for Braithwaite to monitor the female residents in intimate situations.

102.    During this meeting, Braithwaite listed all the tasks he had performed and compared his performance to that of Phillips and Johnson, who had both clearly done less work and performed more poorly yet received better performance reviews.

103.    Nelson responded that Phillips and Johnson received better evaluations than Braithwaite because they had been with YAI longer.  Nelson did not challenge Braithwaite's contention that his performance was superior to that of Phillips and Johnson.

104.    When Braithwaite pointed out to Nelson that her purported reason for his poorer performance review—less seniority than Phillips or Johnson—was transparently dishonest and an unserious justification as seniority is not a metric of performance, Nelson responded by telling Braithwaite she was sorry he did not "agree" with her evaluation.  Nelson did not identify any problems with Braithwaite's performance, and she was unable to provide any substantive justification for why Phillips and Johnson received better performance reviews.

105.    Despite Braithwaite's explicit complaints to Nelson that she was treating him differently based upon his gender and sex, Nelson continued to require Braithwaite to care for female residents in intimate situations.

106.    Furthermore, in addition to the daily discriminatory comments and conduct Braithwaite faced from Nelson, on a regular basis, other YAI employees made offensive comments to

Braithwaite and treated him differently because of his sexual orientation, including, but not limited to the following ways:

- Whenever Braithwaite was talking with other female DSPs, Phillips would collectively refer to the group, including Braithwaite, as "ladies".

- Braithwaite was the only male DSP ever assigned to cook for the residents.

- **DSP Amanda Ruiz, after learning Braithwaite was gay, asked him if he had HIV**.

107.   At all times relevant to this action, the discriminatory, offensive comments and conduct to which the other DSPs subjected Braithwaite were routine and no effort was made to conceal their discriminatory comments and conduct.

108.   As a result, at all times relevant to this action, Nelson and Martin were aware of or should have been aware of the discriminatory and offensive comments and conduct directed towards Braithwaite by other DSPs about his sex/gender and sexual orientation.

Disability Discrimination, Failure to Accommodate, Hostile Work Environment, Retaliation, and FFCRA/EPSLA Violations

109.   Severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) ("COVID-19" or "Coronavirus") is a viral infectious disease that attacks several organ systems and bodily functions.

110.   Coronavirus can be easily transmitted from person to person in several ways, including by inhalation of respiratory droplets from an infected person who coughs, talks, sneezes, or breathes.  As a result, a primary method of transmission of Coronavirus is being in close physical proximity to an infected person.

111.   The severity of symptoms individuals infected with Coronavirus may experience varies greatly.  Some individuals are asymptomatic, others experience mild or moderate symptoms, and others suffer from severe symptoms.

112.    The symptoms presented in each individual infected with Coronavirus also vary greatly. Infected individuals may present with one or more symptoms including, but not limited to: loss of sense of smell and taste, fever, cough, fatigue, muscle aches, and reduced function of the lungs, heart, and brain.

113.    Coronavirus infection can result in severe medical complications including, but not limited to: pneumonia and trouble breathing, organ failure in several organs, heart damage, acute respiratory distress syndrome, blood clots, and increased susceptibility to other viral and bacterial infections.

114.    A severe Coronavirus infection can require hospitalization, life-saving, invasive procedures such as intubation, and can result in death.

115.    Certain preexisting conditions, including asthma and hypertension, substantially increase the likelihood an individual infected with Coronavirus will develop severe symptoms as a result of the Coronavirus infection.

116.    In and before August 2020, no publicly available Coronavirus vaccine existed.

117.    In and before August 2020, no publicly available cure for Coronavirus existed.

118.    By March 2020, Coronavirus was a global pandemic.  In or around March 2020, New York City was suffering from exceptionally high Coronavirus infection, hospitalization, and death rates.

119.    During Braithwaite's employment with YAI, prior to March 2020, Braithwaite mentioned to Nelson and others that he had severe asthma and hypertension.

120.    In or around March 2020, Braithwaite told Nelson he did not feel comfortable accompanying residents to the hospital.  Braithwaite explained that because of his severe asthma and hypertension, he was particularly susceptible to severe and potentially fatal

complications from Coronavirus infection.  Braithwaite further explained he could not tolerate the increased risk of contracting Coronavirus as a result of the close contact required to accompany a potentially ill resident or his presence in the hospital with other potentially infected individuals.

121.    Nelson responded by rhetorically asking Braithwaite if he was refusing to work with a resident and indicating that he will face consequences if he does not comply with her directions.

122.    At all times relevant to this action, Nelson and YAI never asked Braithwaite for any medical information relating to Braithwaite's need for an accommodation due to his severe asthma and hypertension.

123.    At all times relevant to this action, Nelson and YAI ignored Braithwaite's request for an accommodation due to his severe asthma and hypertension.

124.    On or about August 5, 2020, a female resident at Tiffany House was running a fever. Due to concerns the resident was infected with Coronavirus, YAI determined that the resident should be taken to the hospital for testing.

125.    From the commencement of Braithwaite's employment with YAI until in or around March 2020, YAI policy required a DSP to monitor only non-independent residents who needed to be hospitalized from the time the resident left Tiffany House until the resident returned from the hospital.

126.    As a result, the DSP who accompanies a resident to the hospital is required to monitor the hospitalized resident until the resident returns to Tiffany House or the accompanying DSP is relieved by another DSP.

127.    A hospitalized resident will almost invariably require some level of intimate care during their hospitalization.

128.    In or around March 2020, as a result of the severity of the effects of the Coronavirus pandemic on New York, YAI no longer required DSPs to monitor any residents—including non-independent residents who needed to be hospitalized—from the time the resident left Tiffany House until the resident returned.

129.    On August 5, 2020, other female DSPs, including Johnson, were on shift and able to accompany the female resident to the hospital.

130.    Despite the Coronavirus-related policy pausing the requirement for DSPs to accompany residents to the hospital, Nelson's knowledge the female resident would almost certainly require intimate care, Braithwaite's request not to accompany any residents to the hospital on account of his elevated Coronavirus risk factors, and the availability of other female DSPs to accompany the female resident, Nelson directed Johnson to order Braithwaite to accompany the resident to the hospital.

131.    Braithwaite immediately called Nelson directly and told her he would not go with the resident to the hospital, reminding Nelson of his health issues and that he was not supposed to be accompanying the female residents.  Braithwaite also reminded Nelson that female DSPs were available to accompany the resident to the hospital.

132.    Nelson responded by aggressively accusing Braithwaite of laziness and pushing work off on other employees and insinuated Braithwaite would be disciplined if he did not go to the hospital.  Nelson insisted Braithwaite, rather than a female DSP, accompany the female resident to the hospital, because the two available female DSPs—Johnson and Donna (last

name currently unknown)—were scheduled to end their shifts at 11:00 p.m., before Braithwaite's shift was scheduled to end.

133.    At all times relevant to this action, it was standard practice for DSPs who accompanied residents to the hospital when necessary to do so at any point during the DSP's shift.

134.    At all times relevant to this action, when a DSP accompanied a resident to the hospital, it was standard practice for YAI to provide relief for any DSP whose shift ends when he or she is at the hospital.

135.    However, on August 5, 2020, Nelson insisted Braithwaite accompany the female resident to the hospital.  Nelson insisted on Braithwaite accompanying the female resident to the hospital despite the availability of other female DSPs because she did not want to pay for a cab for another DSP to relieve either of the female DSPs whose shifts were ending before Braithwaite's.  When Braithwaite suggested the resident may not require a DSP to accompany her to the hospital because she was independent, Nelson told Braithwaite that was not an option.

136.    After Nelson relentlessly pressured Braithwaite and threatened him with discipline, he felt had no choice but to relent and reluctantly agreed to accompany the resident to the hospital.

137.    Braithwaite was extremely upset by Nelson requiring him to accompany the female resident to the hospital because of the substantially increased Coronavirus exposure and because he was almost certainly going to be required to provide intimate care for the female resident.

138.    Braithwaite had no involvement in dressing, changing, or otherwise preparing the resident to be transported to the hospital.

139.    In or about the evening of August 5, 2020, Braithwaite accompanied the resident to

NYU-Langone Urgent Care ("Urgent Care").

140.    While at Urgent Care, Braithwaite waited with the resident, who had to use the bathroom

several times.  Because there were no female DSPs present, Braithwaite insisted on paging a

nurse every time the resident needed to use the bathroom.  The responding nurse, who was

female, became frustrated at Braithwaite's regular pages and handed him a bedpan.

Braithwaite insisted the female nurse position the bedpan under the resident, to limit his

intimate contact with the resident.  As the nurse was positioning the bedpan under the

resident, **she noticed the resident was not wearing any underwear**.  The nurse accusatorily

asked Braithwaite if he knew the resident was not wearing underwear, and he forcefully

explained he had no knowledge of her lack of undergarments and had no role in dressing the

resident before she left Tiffany House.

141.    Early in the morning of August 6, 2020, Braithwaite continued to stay with the resident at

Urgent Care.  The nurse advised Braithwaite that the resident tested positive for Coronavirus

and would need to be transferred to the NYU Langone Hospital—Brooklyn, a larger facility.

142.    At approximately 5:00 a.m. on August 6, 2020, Braithwaite texted Nelson that the

resident tested positive for Coronavirus.  Braithwaite further told Nelson that he was asked

by the nurse if he knew the resident was not wearing any underwear.

143.    Early in his employment at YAI, Braithwaite was told Nelson was on call 24/7 and to be

contacted for instructions in emergencies.  However, Nelson did not respond to the texts

Braithwaite sent at approximately 5:00 a.m. on August 6, 2002.  Braithwaite's shift was

scheduled to end at 7:00 a.m., and as Nelson did not respond to his text, Braithwaite was left

without any direction from YAI and a resident who needed to be transferred to another medical facility.

144.    At approximately 7:00 a.m. on August 6, 2020, Johnson called Braithwaite.  Johnson told Braithwaite the nurse at Urgent Care contacted her about the resident not wearing any underwear.  Johnson then asked Braithwaite if Nelson or the nurse had reached out to him. Braithwaite responded he had not heard from anyone at YAI or the nurse and was glad to speak with the nurse.  Johnson was very apologetic to Braithwaite, noting he should not have been at the hospital in the first place.

145.    On August 6, 2020 at approximately 7:15 a.m., Nelson called Braithwaite.  Braithwaite reiterated his texts from several hours prior—that the resident tested positive for Coronavirus and was not wearing any underwear, which the Urgent Care nurse discovered.  Braithwaite asked Nelson if another DSP was coming to relieve him, since his scheduled shift was supposed to end at 7:00 a.m.

146.    Nelson responded that because the resident was independent, Braithwaite could leave the resident at the hospital with no relief.

147.    When Braithwaite told Nelson he needed a cab to Tiffany House to pick up his belongings, Nelson agreed to pay for a cab.

148.    Shortly after his phone call with Nelson, Braithwaite took a cab from the hospital to Tiffany House, leaving the resident without accompaniment from anyone at YAI.

149.    On August 5, 2020, YAI could have accommodated Braithwaite's request not to accompany residents to the hospital by allowing the resident to travel to the hospital by herself.

150.    On August 5, 2020, YAI could have accommodated Braithwaite's request not to accompany residents to the hospital by sending another DSP to accompany the female resident.

151.    At all times relevant to this action, Braithwaite's request to not to accompany residents to the hospital due to his susceptibility to severe complications from a Coronavirus infection was reasonable.

152.    At all times relevant to this action, YAI was able to accommodate Braithwaite's request to not to accompany residents to the hospital without any undue hardship to the operation of YAI's business.

153.    At all times relevant to this action, Braithwaite's disabilities did not affect his ability to perform the material functions of his job as a DSP at YAI.

154.    Braithwaite was scheduled to work a shift later on August 6, 2020.

155.    Because he was exhausted from the prior evening and extremely concerned about his exposure to Coronavirus, Braithwaite called Nelson in advance of his shift and told her he was calling out for the evening shift.  Braithwaite also told Nelson he needed to quarantine as a result of his direct exposure to the resident who tested positive for Coronavirus.

156.    Nelson responded by angrily denying Braithwaite's call out for his August 6, 2020 shift. Nelson further told Braithwaite he could not quarantine because he previously agreed to pick up shifts from other DSPs, and she would now have to find coverage for those shifts.

157.    Braithwaite was upset that Nelson was refusing to allow him to quarantine, despite his direct and prolonged close contact with the resident who tested positive for Coronavirus.

158.    Earlier in 2020, Nelson took approximately three months off work after she believed she was exposed to Coronavirus.

159.    Braithwaite expressed his frustration to Nelson that she took months off to quarantine after exposure to Coronavirus but refused to let Braithwaite quarantine when it was Nelson who unnecessarily exposed Braithwaite to Coronavirus by forcing him to accompany the resident to the hospital.  In response, Nelson became extremely upset and reiterated her refusal to allow Braithwaite to quarantine.

160.    Throughout August 2020, a mandatory quarantine Order was in effect for all New York residents who had been in close contact (defined as within six feet) with someone who is positive for Coronavirus, whether or not they were displaying any symptoms.

161.    On August 5 and August 6, 2020, Braithwaite had direct physical contact, was within six feet for more than ten minutes, and was in the same enclosed space for a sustained period with the female resident who he accompanied to the hospital.

162.    Pursuant to the mandatory quarantine Order in effect in August 2020, Braithwaite was obligated to quarantine for 14 days after his contact last contact with the female resident.

163.    Shortly after Braithwaite's exposure to Coronavirus through contact with the resident he accompanied to the hospital, Braithwaite spoke with his primary care physician.

164.    Braithwaite's primary care physician advised him to quarantine for fourteen (14) days as a result of his exposure to Coronavirus.

165.    After Nelson's refusal to allow Braithwaite to quarantine, Braithwaite contacted TJ (last name currently unknown) ("TJ"), YAI Coordinating Supervisor and Nelson's boss.

166.    Braithwaite recounted the events of the previous day to TJ and told TJ that Nelson refused to allow him to quarantine.

167.    TJ responded that **Nelson should not have sent Braithwaite to the hospital with the female resident**.

168.     Braithwaite told TJ he needed to quarantine due to his exposure to the Coronavirus-positive resident.  TJ replied she had to check YAI's Coronavirus policy.

169.     Later that day, TJ advised Braithwaite that YAI's policy permitted quarantine for only 7-10 days, and he would not be paid for the time he was quarantining.

170.     At all times relevant to this action, YAI's Coronavirus policies did not provide a maximum 80 hours of paid leave for employees who took leave pursuant to any federal, state, or local quarantine or isolation order related to Coronavirus.

171.     The next day—August 7, 2020—TJ called Braithwaite and told him YAI would pay him for quarantining for his scheduled shifts over the next week, but not the additional shifts he picked up for that week.

172.     Despite Braithwaite telling both Nelson and TJ that his doctor told him to quarantine for 14 days, TJ told Braithwaite YAI would only permit him to quarantine for seven days.

173.     As Braithwaite picked up extra shifts almost every week he worked for YAI, YAI's plan to pay Braithwaite for only the shifts he was scheduled would result in Braithwaite receiving pay for fewer hours than he regularly worked in a week.

174.     Shortly after speaking with TJ, Braithwaite contacted Alec (last name currently unknown) ("Alec"), a representative from YAI's Human Resources Department, to confirm it was YAI's policy not to pay him for the "additional" shifts and to confirm TJ's understanding that it was against YAI policy for male DSPs to care for female residents.

175.     Alec told Braithwaite he would call Braithwaite back with the answers to his questions. However, neither Alec nor anyone else from YAI called Braithwaite back to provide confirmation of YAI's policies.

176.     From August 7 to August 14, 2020, Braithwaite quarantined.

177.    While Braithwaite was quarantining, Nelson texted Braithwaite and pressured him to return.

178.    YAI required Braithwaite to return from his quarantine leave on or about August 15, 2020—several days before the expiration of the 14 day quarantine Braithwaite was advised was necessary by his doctor.

179.    On or about August 14, 2020, Braithwaite was no longer able to tolerate the continued discrimination, harassment, retaliation, and unlawful employment practices to which he was subjected at YAI.  On or about August 14, 2020, Braithwaite informed TJ he was not coming back to work due to YAI's discriminatory conduct.

180.    On or about August 14, 2020, Braithwaite accepted his constructive termination from YAI.

181.    On or about August 17, 2020, Braithwaite received a call from an individual identifying himself as an investigator for YAI.  The investigator informed Braithwaite because the resident he accompanied to the hospital was not wearing any underwear, Braithwaite was under investigation.

182.     Prior to the end of his employment with YAI, Braithwaite was never asked by anyone at YAI about the circumstances surrounding the Urgent Care nurse discovering the resident not wearing any underwear, despite repeatedly offering to volunteer relevant information.

183.    If found to be negligent or otherwise responsible for the resident not wearing underwear, Braithwaite is subject to significant potential consequences to his career opportunities.  The consequences of an adverse finding may include, but are not limited to: notification of an adverse finding to licensing agencies, a public or semi-public record of the adverse finding,

and suspension of, revocation of, or prohibition from obtaining certain professional licenses. An adverse finding may also subject Braithwaite to civil or criminal liability.

184.    At all times relevant to this action, Braithwaite has not received a written determination of the results of YAI's investigation into his responsibility for the resident not wearing any underwear.

185.    At all times relevant to this action, Braithwaite is unaware of and has not been advised in writing of any action taken by YAI—such as reporting Braithwaite to a licensing board or other government agency—as a result of YAI's investigation into his responsibility for the resident not wearing any underwear.

186.    At all times relevant to this action, Braithwaite had no involvement in or responsibility for dressing the resident he accompanied to Urgent Care on or about August 5, 2020.

187.    Had YAI granted Braithwaite's request to not accompany residents to the hospital due to his heightened vulnerability to consequences of contracting Coronavirus because of his severe asthma and hypertension, he would not have been with the resident when the nurse discovered she was not wearing underwear and, as a result, would not have been subjected to an investigation that put his career in jeopardy.

188.    After his employment with YAI ended, Braithwaite received his final paycheck.  The pay period encompassed by Braithwaite's final paycheck included all the days Braithwaite was on quarantine sick leave.

189.    Despite taking quarantine sick leave from on or about August 7, 2020 until August 14, 2020, Braithwaite was paid for only 48 hours of quarantine leave.

190.    YAI denied Braithwaite the full fourteen (14) day quarantine leave that he was advised to take by his doctor.

191.  In the six months prior to August 7, 2020, Braithwaite worked an average of approximately 80 to 100 hours per week at YAI.

192.  But for Nelson's discriminatory demand that Braithwaite—because he is gay and thus, did not pose a "threat" to the female resident—accompany the female resident to the hospital, Braithwaite would not have been in close contact with the female resident and would not have needed to quarantine.

193.  But for Nelson's discriminatory refusal to accommodate Braithwaite's request to not accompany residents to the hospital due to his susceptibility to severe complications from a Coronavirus infection caused by his severe asthma and hypertension, Braithwaite would not have been in close contact with the female resident and would not have needed to quarantine.

194.  YAI exposed Braithwaite to Coronavirus as a result of Nelson's discriminatory treatment of Braithwaite due to his sex/gender, sexual orientation, and disabilities.

195.  At all times relevant to this action, Defendants created a hostile work environment and openly discriminated against Braithwaite based on his **sex/gender, sexual orientation, and disabilities**.

196.  Braithwaite's situation at his job was intolerable as a result of the discrimination and hostile work environment to which he was subjected by Defendants.

197.  Defendants' unwanted hostile actions created a hostile work environment which no reasonable person could be expected to tolerate.

198.  At all times relevant to this action, Braithwaite's disabilities did not prevent him from performing the material functions of his job.

199.  Despite being aware of Braithwaite's disabilities and his need for accommodations, Defendants refused to provide him reasonable accommodations.

200.    Throughout Braithwaite's employment with Defendants, Braithwaite complained to Defendants about this unlawful conduct.

201.    After and because Braithwaite complained to Defendants, Braithwaite became the subject of retaliation by Defendants.

202.    During Braithwaite's employment with the Defendants, Braithwaite was and continued to be regularly exposed to a discriminatory, offensive, and hostile work environment until his discriminatory and retaliatory constructive termination.

203.    Braithwaite further objected to Defendants' unlawful failure to properly compensate him for the quarantine sick leave pay to which he was entitled.

204.    After and as a result of Braithwaite's complaints of Defendants' unlawful failure to properly compensate him for the quarantine sick leave pay to which he was entitled, Defendants refused to correct their unlawful pay practices, resulting in Braithwaite being forced to retaliatorily accept his constructive termination.

205.    Defendants' actions and conduct were and are intentional and intended to harm Braithwaite.

206.    Defendants have caused damage and injury to Braithwaite by first subjecting him to a hostile work environment and discrimination and then again by protecting the individuals that caused and created the hostile work environment, while retaliating against him.

207.    Braithwaite has been unlawfully discriminated against, was humiliated, and has been degraded and belittled; and as a result he suffers loss of rights, emotional distress, loss of income, and earnings.

208.    As a result of Defendants' actions, Braithwaite felt extremely humiliated, degraded, victimized, embarrassed, and emotionally distressed.

209.    As a result of Defendants' discriminatory and intolerable treatment, Braithwaite suffered severe emotional distress.

210.    As a result of the acts and conduct complained of herein, Braithwaite has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other compensation which such employment entails, and Braithwaite has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

211.    As a result of the above, Braithwaite has been damaged in an amount which exceeds the jurisdictional limits of all lower Courts.

212.    As Defendants' conduct has been willful, reckless, outrageous, intentional, and/or malicious, Plaintiff also demands punitive damages in an amount which exceeds the jurisdictional limits of all lower Courts.

## FIRST CAUSE OF ACTION
### Discrimination in Violation of Title VII
### (As to Defendant YAI only)

213.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

214.    By the actions described above, among others, Defendants have discriminated against Plaintiff because of his sex/gender, in violation of Title VII.

215.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

## SECOND CAUSE OF ACTION
### Hostile Work Environment in Violation of Title VII
### (As to Defendant YAI only)

216.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

217.    By the actions described above, among others, Defendants have discriminated against Plaintiff and subjected Plaintiff to a hostile work environment because of his sex/gender, in violation of Title VII.

218.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

### THIRD CAUSE OF ACTION
**Retaliation in Violation of Title VII**
**(As to Defendant YAI only)**

219.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

220.    By the actions described above, among others, Defendants have retaliated against Plaintiff by, *inter alia*, refusing to remediate the discrimination and harassment of which Plaintiff complained, forcing Plaintiff to continue working for his harasser after his opposition to her discriminatory practices, and forcing Plaintiff to accept his constructive termination in violation of Title VII for engaging in protected activity.

221.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

### FOURTH CAUSE OF ACTION
**Discrimination in Violation of the ADA**
**(As to Defendant YAI only)**

222.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

223.    American with Disabilities Act, 42 U.S.C § 12112 (a) provides: No covered entity shall discriminate against a qualified individual on the basis of disability in regard to… discharge of employees… and other terms, conditions and privileges of employment.

224.    Defendants are covered entities subject to the provisions of this statute.

225.    Defendants discriminated against Plaintiff on the basis of his disabilities by, among other reasons set forth herein, refusing his requests for reasonable accommodations.

226.    As a direct and proximate cause of Defendants' unlawful discriminatory practices, Plaintiff has suffered lost wages, promotional opportunities, other additional economic losses, extreme mental anguish, embarrassment, stress, anxiety, humiliation and other pain and suffering.

227.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

### FIFTH CAUSE OF ACTION
**Hostile Work Environment in Violation of the ADA**
**(As to Defendant YAI only)**

228.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

229.    By the actions described above, among others, Defendants have discriminated against Plaintiff and subjected Plaintiff to a hostile work environment because of his disabilities, in violation of the ADA.

230.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

## SIXTH CAUSE OF ACTION
### Retaliation in Violation of the ADA
### (As to Defendant YAI only)

231.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

232.    By the actions described above, among others, Defendants have retaliated against Plaintiff by, *inter alia*, forcing him to accept his constructive termination in violation of the ADA for engaging in protected activity.

233.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

## SEVENTH CAUSE OF ACTION
### Discrimination in Violation of the NYSHRL
### (As to all Defendants)

234.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

235.    By the actions described above, among others, Defendants have discriminated against Plaintiff as a result of his gender, sexual orientation, and disabilities, in violation of the NYSHRL.

236.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

**EIGHTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the NYSHRL**
**(As to all Defendants)**

237.   Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

238.   Executive Law § 296 provides for a hostile work environment claim where Plaintiff shows that his work environment involved serious or pervasive harassment… of such quality or quantity that a reasonable employee would find the conditions of his employment altered for the worse.

239.   Plaintiff found his work environment to involve serious or pervasive harassment based on his gender, sexual orientation, and disabilities.

**NINTH CAUSE OF ACTION**
**Retaliation in Violation of the NYSHRL**
**(As to all Defendants)**

240.   Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

241.   By the actions described above, among others, Defendants have retaliated against Plaintiff by, *inter alia*, forcing him to accept his constructive termination in violation of the NYSHRL for engaging in protected activity.

242.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

**TENTH CAUSE OF ACTION**
**Discrimination in Violation of the NYCHRL**
**(As to all Defendants)**

243.   Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

244.   By the actions described above, among others, Defendants discriminated against Plaintiff on the basis of his gender, sexual orientation, and disabilities, in violation of the NYCHRL.

245.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

**ELEVENTH CAUSE OF ACTION**
**Hostile Work Environment in Violation of the NYCHRL**
**(As to all Defendants)**

246.   Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

247.   Pursuant to the New York City Administrative Code, a Plaintiff can establish a hostile work environment claim if he can show that he was treated less well than other employees because of his protected class.

248.   Plaintiff was treated less well by the Defendants because of his gender, sexual orientation, and disabilities.

249.   By the actions described above, among others, Defendants subjected Plaintiff to a hostile work environment on the basis of his gender, sexual orientation, and disabilities, in violation of the NYCHRL.

250.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

**TWELFTH CAUSE OF ACTION**
**Retaliation in Violation of the NYCHRL**

**(As to all Defendants)**

251.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

252.    Pursuant to the New York City Administrative Code, it is an unlawful discriminatory practice for any person to retaliate or discriminate in any manner against any person because such person has opposed the discriminatory practices.

253.    By the actions described above, among others, Defendants have retaliated against Plaintiff by, *inter alia*, forcing him to accept his constructive termination in violation of the NYCHRL for engaging in protected activity.

254.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of monetary damages and other relief.

### THIRTEENTH CAUSE OF ACTION
**Failure to Provide Quarantine Sick Leave Pay in Violation of the FFCRA and EPSLA
(As to Defendant YAI only)**

255.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

256.    The EPSLA, a provision of the FFCRA, requires an employer to provide 80 hours of paid sick leave to a full-time employee quarantining due to Coronavirus related conditions including, *inter alia*, because the employee is subject to a Federal, state, or local quarantine or isolation order related to Coronavirus.

257.    Pursuant to the EPSLA, an employer who fails to provide mandatory Coronavirus paid leave is deemed to have failed to pay the employee the minimum wage pursuant to the Fair

Labor Standards Act ("FLSA") and subject to the enforcement provisions and penalties of the FLSA.

258.    By the actions described above, among others, Defendants willfully failed to provide Plaintiff 80 hours of paid sick leave taken as a result of his being subject to a Federal, state, or local quarantine or isolation order related to Coronavirus.

259.    Due to Defendants failure to provide Plaintiff with the full amount of Coronavirus-related paid sick leave to which he is entitled, Defendants have failed to pay Plaintiff the minimum wage.

260.    As a result of Defendants' willful violations of the FFCRA and EPSLA, Plaintiff is entitled to recover from Defendant her unpaid minimum wages, liquidated damages, pre-judgment interest, post-judgment interest, attorneys' fees, and costs and disbursements of this action pursuant to 29 U.S.C. § 216(b).

## FOURTEENTH CAUSE OF ACTION
### Retaliation in Violation of the FFCRA and EPSLA
### (As to Defendant YAI only)

261.    Plaintiff Braithwaite repeats, realleges, and restates each and every paragraph above as if said paragraphs were more fully set forth herein at length.

262.    The EPSLA prohibits an employer from discharging, disciplining, or discriminating against any employee who takes leave pursuant to the FFCRA or EPSLA or who has filed any complaint or caused to be instituted any proceeding under or related to the FFCRA or EPSLA.

263.    Pursuant to the EPSLA, an employer who willfully retaliates against an employee for asserting their rights under the FFCRA or EPSLA is deemed in violation of and subject to the penalties set forth in the anti-retaliation provisions of the FLSA.

264.    By the actions described above, among others, Defendants willfully retaliated against Plaintiff by, *inter alia*, forcing him to accept his constructive termination after he complained of Defendants' unlawful failure to provide him with 80 hours of paid sick leave taken as a result of his being subject to a Federal, state, or local quarantine or isolation order related to Coronavirus.

265.    As a result of Defendants' retaliatory conduct, Plaintiff is entitled to recover from Defendants lost wages and other compensatory damages, in addition to reasonable attorneys' fees, costs, declaratory and injunctive relief.

## INJURY AND DAMAGES

266.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss and/or partial loss of a career and the loss and/or partial loss of a salary, bonuses, benefits and other compensation which such employment entails, out-of-pocket medical expenses and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, injury to reputation, loss of enjoyment of life, and other non-pecuniary losses.  Plaintiff has further experienced severe emotional and physical distress.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the practices complained of herein are unlawful under applicable federal and state law;

B.    An injunction and order permanently removing and clearing information to the contrary contained in Plaintiff's employee file and restraining Defendants from engaging in such unlawful conduct;

C.  Directing Defendants to place Plaintiff in the position he would have occupied but for Defendants' discriminatory, retaliatory, and otherwise unlawful conduct and making Plaintiff whole for all earnings and other benefits he would have received but for Defendants' discriminatory and retaliatory treatment, including, but not limited to, title, seniority status, wages and other lost benefits;

D.  An award of compensatory damages as of result of Defendants' violation of Title VII, the ADA, the NYSHRL, and the NYCHRL;

E.  An award of compensatory damages as a result of Defendants' violation of the FFCRA, EPSLA, and supporting regulations;

F.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to, the loss of past and future income, wages, compensation, and other benefits of employment;

G.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional and psychological pain and suffering, emotional and psychological distress and the physical manifestations caused;

H.  A declaratory judgment that Defendants' violations of the FFCRA and EPSLA were willful;

I.  An award of liquidated and/or punitive damages in amount equal to the total amount of wages found to be due, pursuant to the FFCRA and EPSLA;

J.  An award of damages to Plaintiff, retroactive to the date of his termination, for all lost

wages and benefits resulting from the Defendants' unlawful employment practices in an amount that exceeds the jurisdictional limit of all lower courts;

K.  An award of prejudgment and post-judgment interest;

L.  An award of costs and expenses of this action together with reasonable attorneys' fees;

M.  An award of punitive damages;

N.  An award of such other relief that the Court deems just and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: February 4, 2021
       New York, New York

Respectfully submitted,

**Akin Law Group PLLC**

*/s/ Justin Ames*
_____
Justin Ames

45 Broadway, Suite 1420
New York, NY 10006
Telephone:  (212) 825-1400
Facsimile:  (212) 825-1440
justin@akinlaws.com

*Counsel for Plaintiff*
